ALBANY,
February, 1805.

Smith
v.
Steinbach.

Paschal N. Smith
*against*
Joaquim L. Steinbach.

A policy on freight at and "from" a foreign port, attaches on the commencement of lading the goods on board. A vessel seized on suspicion of a breach of neutrality is not, from such a circumstance, to be held guilty of a breach of neutral conduct. An abandonment is never too late if the loss continue total at the time of the action brought. A demurrer to evidence confesses every fact which the jury could have found from the evidence. A seizure by a foreign state, of a vessel in a port of that state under a suspicion of a

IN error upon a judgment pronounced by the supreme court* in favour of the defendant, on a demurrer to evidence.

The count averred a loss under the policy from arrest and detention by the *Spanish* government. The testimony to support this, and demurred to on the trial, showed an insurance on the freight of the ship *Catharine*, then at *Barcelona*, effected on the 23d of *October*, 1800; a seizure of the vessel by the *Spanish* government, in the *September* preceding, on suspicion, that " the captain had aided a *British* frigate in cutting out, and capturing two *Dutch* vessels." An abandonment on the 30th day of *December*, 1801, between which time and *September*, 1800, a witness, examined in the cause, proved that opportunities from *Barcelona*, to *New-York*, were frequent, and had occurred. Lastly, a subsisting detention in *July*, 1802.

KENT C. J. read the opinion of the supreme court as delivered by *Livingston*, J. from 2 *N. Y. T. R.*

* *See 2 N. Y. T. R. 129 to 134.*

breach of neutrality, is a loss within the clause in a policy of insurance against the restraint of princes, &c.

ALBANY,
February, 1805.

Smith
v.
Steinbach.

130. Mr. *President*. Several objections were made to the plaintiff's right of recovering. 1st. It was alleged that the voyage contemplated, while the *Catharine* was at *Barcelona*, was different from the one insured, and that therefore the risk never commenced. The insurance being *at* and from *Barcelona*, it may admit of doubt, whether, as the loss happened there, the defendants would not be liable, although a voyage to the *Havanna* were in contemplation. But on this point of law, we gave no opinion, because it was sufficiently proved that the vessel was destined for *Baltimore*. Thus have the jury found, in another action on a policy on the ship, nor could their verdict have been different, without disregarding all the testimony in the cause. The defendants themselves were aware that this finding comported with the evidence, and, accordingly, directed their principal attack against the testimony itself ; for they said—2d. That *Mumford* was the plaintiff's witness, and therefore could not be discredited by him.—Whether this gentleman be regarded as the witness of the one or of the other party, is not very material in deciding this cause : he had been examined out of court, at the instance of the defendants, and cross-examined by the plaintiff, who produced his deposition on the trial. Perhaps the best general rule in such cases, would be to consider the witness, if his deposition be read, as belonging to the party on whose application he was examined, without any regard to the person who may finally make use of it. But without deciding this point, we thought nothing was done by the plaintiff to discredit *Mumford*, even if he had been his witness. It is not every mistake which a witness may make, when speaking from memory, that will discredit him.

and it would be a strange rule, indeed, that a party producing a witness, should not be permitted, even by the witness himself, to correct a mistake which he may have committed. Nothing more was done. *Mumford* had sworn, that from certain papers, the destination of the cargo, according to his recollection, appeared to be for the Havanna : after this, there could be no impropriety in showing him the papers to which he alluded, or any other to refresh his memory, and to enable him to correct his error, if he had made one. This was no imputation on his character ; it neither rendered him infamous nor unworthy of credit, as to the other point to which he had deposed :—It discovered in the witness a laudable promptitude to rectify a mistake, into which an imperfect recollection had betrayed him, and thus added to, rather than detracted from, the weight of his testimony. 3d. The exhibits B. and C. being only copies, should not, it was said, have been produced. If no allusion had been made to these papers, by *Mumford,* they could not have been produced, to show the real object of this voyage, but he had already testified that he had made out certain claims against the *Spanish* government, for the *Catharine* and her cargo, which stated the vessel to be bound directly for the *West-Indies ;* these papers, he added, were lodged in the Consulate office, at *Barcelona.* —Having sworn thus far from memory, the plaintiff had a right to refresh his recollection, by the showing him copies of the claims referred to ; on inspection, he might probably be able to determine whether they were true copies or not, and certainly if he believed them true, they would furnish better evidence

of what the originals contained, than any parol ac-
count of their contents, which was the only way in
which the defendants had attempted to prove them.
There is no reason to say, the originals were in the
plaintiff's possession. They remained in a public office
in *Spain :* and this kind of inferior proof, was
rendered proper by the defendants' own conduct.
They had not only examined the witness, as to the
contents of these papers, but gave the plaintiff every
reason to believe, that nothing would be required of
him, but proof that the property was American. 4th.
The abandonment, it was said, was too late. The *Ca-
tharine* was seized in *September*, 1800, and not aban-
doned until fifteen months thereafter. It has already
been decided by the supreme court, in *Earl* v. *Shaw*,
that an abandonment may be made at any time after
the accident, provided, at the date of the abandonment,
the loss still continue total. This being the case here,
the abandonment was in season. 5th. It is contended
that Mr. *Mumford* was mistaken or surprised on his
cross-examination, and that, therefore, a new trial
should be had. For this purpose, his affidavit was pro-
duced, taken nine months after the trial, in which
he stated, that the captions of the exhibits B. and C.
were not shown to him, to the best of his knowledge
and belief, and endeavoured to explain why they were
made as they appeared; to wit, to prevent endangering
the insurance. This explanation came too late; a
witness under examination may explain and correct
himself, but it would be dangerous and improper to re-
ceive any elucidation from him, after the trial, and
especially after the lapse of so many months: besides,
the defendants were apprised of his deposition, long

X

before the trial, and were without excuse, for not calling on him then, to make such explanations as might have been deemed important. 6th. But it was said there had been a discovery of new evidence, and for that reason there should be another trial. It was also said, that if a new trial had been granted, there were two witnesses who were not known to the defendants at the time of the trial, who could testify as to the destination of the *Catharine.*—This was the fact principally controverted on the former trial, and we were applied to for another, merely because all the witnesses who knew something of the matter, had not been examined.\* Every one must perceive the inconvenience and delay which would arise from granting new trials, upon the discovery of new testimony, or other witnesses to the *same* fact. It often happens that neither party knows all the persons who may be acquainted with some of the circumstances relating to the point in controversy: if a suggestion, then, of the present kind be listened to, a second, if not a third and a fourth trial, may always be had: there may be many persons yet unknown to the defendants who may be material witnesses in this cause, and this may continue to be the case after a dozen trials. Cases may occur in which, if great doubts exist, as to the first decision, it may be proper, on the discovery of further witnesses, even to the same fact, to open the cause for a second discussion ; but this is not one of them. The principal fact here was clearly proved, and if Lewis and Byrnes had both been examined, it is very uncertain whether the result would not have been the same.

\* It is no ground for the court to grant a new trial, that a witness called to prove a certain fact, was rejected on a supposed ground of incompetency, where another witness who was called, established the same fact, and the defence proceeded upon a collateral point on which the verdict turned. Edwards v. Evans, 3 East, 451.

*Pendleton*, for the plaintiff. The effect of a demurrer to evidence is, that the demurrant, admitting all the facts which appear in evidence on the trial, still says they are not sufficient to entitle the party who produces them, to recover or maintain the issue. The proceeding is founded on this principle, that where facts are agreed on, there is no occasion for the determination of a jury ; for, all that is then necessary, is to pronounce the law on them. But when the facts are not agreed to, then they go to a jury to determine their existence. In this case the facts stated, are acknowledged. The court is now to decide whether every fact necessary to entitle to a recovery for the loss claimed, has been proved. If not, we think ourselves justified in saying there must be a reversal ; because it is, in all actions, the duty of a plaintiff to make good his claim, it being never required of a defendant, to show negatively, that there is no title to a recovery. An insured, then, ought to establish, that the subject matter was at the risk of the underwriter ; that it was in such a situation, as to be within the terms of the policy, and the nature of the loss such as will authorise a resort to the assurer. On the present occasion, it should have been made to appear, not only that the *Catharine* was at *Barcelona*, but bound to *Baltimore*, on the voyage insured, and that under these circumstances, she was seized. To this, the proof is inadequate. For though the being at *Barcelona*, and the seizure are established, there is a defect in the testimony, as to the port of destination ; unless, indeed, the court may infer that the *Catharine* was to go on the voyage described,

merely from her being at the port from whence insur-
ed. This can never be a matter of inference, for it
is laid down, that " the loss must *appear* to have hap-
pened during the continuance of the risk." *Marsh.*
615. In *Wooldridge* v. *Boydell, Doug*. 16, the words
were " *at* and from *Maryland* to *Cadiz*," but because
it was not shown that the vessel was bound on the
voyage insured, it was held that the policy did not
attach, and the plaintiff not entitled to recover. The
same principle is found in *Murdock* v. *Potts, Marsh.*
230. The mere being *at* a port does not comprehend
sufficient proof, that the vessel was there for the pur-
pose of pursuing the voyage described. Though a de-
murrer to evidence admits the facts proved, it does not
warrant the presumption of a fact not in evidence. If
such may be inferred, the party demurred to, should
specify them, and is not bound to join in demurrer till
they be admitted, or proved. If, however, such fact
be material for the determination of the cause, as it
neither admitted nor proved, but only inferred, there
should be a *venire de novo* directed. This, however,
is not that, on which we principally rely. We con-
tend, that as the plaintiff founds his claim on a seizure
upon suspicion of an act of his agent, which, if true,
would amount to a violation of neutrality, and vacate
the policy, he was bound also to establish, that there
was no ground for the suspicion. Not having done
so, and joining in demurrer, he has admitted the
cause of suspicion to be well founded, and cannot,
therefore, recover. We insist also, that the rule
adopted in the supreme court of allowing the under-
writer at any period to bring his action, and recover

as for a total loss, if the loss then continue total, is erroneous. The principle of insurance law is, that the assured, when informed of an event by which he is entitled to abandon, ought to elect to do so, within a reasonable time. If within such time this be not done, it is to be presumed that he has elected not to abandon, and the underwriter will be liable only to an average loss. In *Marshall*, 508, the rule on this subject is accurately stated. He says, " that as soon as the insured receives advice of a total loss, he must make his election, whether he will abandon or not. If he determine to abandon, he must give the underwriters notice of this, within *a reasonable time*, after the intelligence arrives ;· and any unnecessary delay in giving this notice, will amount to a waiver of his right to abandon ; for unless the owner does some act, signifying his intention to abandon, it will be only a partial loss, whatever may be the nature of the case, or the extent of the damage." This doctrine is justified by reason, as well as authority.— Abandonment is the act by which the assured transfers to the underwriter, the chance of recovering what is saved, and calls upon him, as if the subject insured had been totally lost. For where there has been an actual total loss, there can be no abandonment. For it is founded on a supposition, that something has been saved, or maybe so. It is, however, an extreme remedy, and allowable only in extreme cases. If the property be in such a situation, that it may be recovered, the equity of the law says, we will not oblige the assured to wait the event, but we will permit him to call on his underwriter, who shall take the chance of recovery. Hence, it is optional, whe-

ALBANY,
February, 1805.

Smith
v.
Steinbach.

* In *Hamilton*
v. *Mendez.*

ther an insured will abandon or not. " The insured is not obliged to abandon in any case. He has an election." *Per Lord Mansfield, Marsh.* 494.* But his election is a positive act, of which notice must be given, in order to place the underwriter in a situation to look after the property. What act is to be done, to evince the intention of not abandoning.— None that is overt. It can be manifested only by being passive. Therefore, abstaining from abandoning, must be an election not to abandon. Proceeding in attempts to recover the property, is evidence that an abandonment of it was never contemplated, and an indemnity for the expenses incurred, all that was looked forward to. Fourteen months passed without any notice taken of the accident.— After such a lapse of time, it is to be presumed, that the party has elected to run, himself, the chance of recovery. If not, and no limitation be put to the period, within which an insured must elect, it can never be known to an underwriter, when his responsibility ceases; it may last forever. The convenience of the thing, therefore, requires, that abandonments should be allowed only within a reasonable time, and *that* should be limited by the period, within which, communication is in general received, unless it be shown, that none has arrived. The contrary doctrine opens a door to fraud, and affords an opportunity to speculate on the underwriter. Under a particular clause in our policies, the underwriter is to pay all charges incurred in defending the subject of his policy. Is the assured to go on for any length of time, involving his insurer to any amount of expenses, and if the property be recovered, take it to

himself, if not, claim for a total loss, and demand payment of the expenses also ? Surely, where the whole of the subscription is to be required, the insurer ought to have a discretion allowed him, to pay the amount, and relinquish the pursuit. By such a system, the assured cannot suffer, though, by rejecting it, the assurer may. The underwriter has a right to insist on being put in a situation to act for himself, and not to have forced upon him an agent, whose interest it is to hazard every kind of expenditure, because, whatever may be the result, he cannot lose, and may gain. It is inequitable, that the underwritten should, at his pleasure, wait the termination of the accident, before he abandons, and yet the underwriter not be able to act for himself, but at the permission of the insured. He ought to be obliged to elect to abandon or not, before the consequences of the event are known, and not to be at liberty, without notice, to saddle the insurer with expenses and charges. No country leaves the period of abandonment totally in the breast of the underwritten. By many nations, the time within which to be made, is expressly limited. But to leave it without bounds, is held to be law in this state alone. The *English* decisions are in conformity to the principles I have advanced. In *Mitchell* v. *Edie, Marsh.* 510, Mr. justice *Ashhurst* says, " the insured are bound to decide and signify their election to the underwriters the first opportunity; for though the person who takes upon him to act on the occasion, for the benefit of all concerned, is not the agent of the insured; yet, if, upon receiving notice of the loss, they do not elect to abandon, they adopt the acts of such person, and make him their agent." In ano-

ALBANY,
February, 1805.

Smith
v.
Steinbach.

* Allwood v.
Henkell, Park,
172.

ther case,* the having sent a letter of attorney to receive and remit the proceeds of a cargo sold, and lying in a court of admiralty, was held such an intermeddling, as to destroy the right to abandon, for, said lord *Kenyon* " the insured must make his election speedily, and put the underwriter in a situation to do what is necessary for the preservation of the property, whether sold or unsold." By the 42d art. of the marine, it is required to give instant notification of the loss, with a declaration of having elected to abandon, when the period allowed so to do, has expired. 2 *Emer.* 180. From this, it appears, that the principle we contend for, is acknowledged even by the law of *France*, which does not exact an immediate abandonment.

*Hoffman* and *Harison*, contra. A demurrer to evidence not only admits every fact which has been offered in testimony, but every deduction which, from those facts, a jury *might* make. This is consonant to the reason of the thing. For, as by such a proceeding, the case is taken from the jury to the bench, the court is substituted in their place, and may make every inference they might draw. By adopting this mode of procedure, a party cannot deprive his adversary of any advantages a jury trial would afford.—He concedes, that they shall all be his, if the evidence be determined sufficient to maintain the issue. After the applicability and legal qualities of the testimony are allowed, the court pronounces the judgment in conformity to what they think a jury would have been warranted in determining. These principles have been settled in the *English* courts, by the case of *Cocksedge* v. *Fanshaw*, *Doug.* 119, and in ours, by that of *Livingston* v. *Shutz*. We con-

tend that the circumstances of a vessel being at a
port, taking in her cargo there, and a policy effected
on the freight to arise on that cargo, from the port
where she was, to another, are sufficient to warrant
an inference, that she was destined for the port
to which insured.  But we are told, that having
shown a seizure on suspicion, we ought to have prov-
ed that suspicion to have been groundless, or it must
be presumed it was well-founded.  This is contrary
to every principle of law, and repugnant to the na-
ture of the proceedings now before the court. 1st. As a
matter of defence, it ought to be made appear, by
the now plaintiff.  2d. As the demurrer admits the
fact of the seizure, it is to request a presumption
against the plaintiff's own admission.  He who de-
murs to evidence, asks nothing for himself, but denies
that his opponent has shown any right.  For a person
tendering a demurrer, no presumption, therefore, can
be made, as he concedes all presumptions are to be on
the side of his adversary.  That the right of aban-
donment is taken away, unless exercised immedi-
ately after notice of the loss, is not, as a universal
rule, warranted by the cases cited.  They establish
no more, than that when the restoration of the pro-
perty, or any other circumstance, shows the loss is
no longer total, the assured cannot, by an abandon-
ment *then* made, convert that which is at the time,
a partial into a total loss, merely because it had
once technically subsisted.  Thus, in *Mitchell* v.
*Edie*, the vessel, after being captured and plunder-
ed, was restored, but, from the taking away of her
rigging, obliged to make for a port of necessity,
where the proceeds of the cargo were in the hands of
a part owner for near three years, and the underwri-

Y

ALBANY,
February, 1805.

Smith
v.
Steinbach.

* 1 *vol.* 21.

ters called on, merely because he had failed. The court held this a partial loss, not to be turned into a total one, by abandonment. So in *Allwood* v. *Henkell*, the vessel was captured, recaptured, restored on salvage, and the money in the admiralty.— The total loss had ceased, and, therefore, there could be no abandonment. On this principle, the determination of *Church* v. *Bedient* and *Kimberly** proceeded. If, indeed, the underwriter has paid the loss, he then becomes a purchaser of the subject insured, and though it be afterwards recovered, it will belong to him. *Da Costa* v. *Firth*, 4 *Burr.* 1966. The consequence will be the same, though it be, in fact, restored at the time the amount of the subscription is paid. It is a fallacy, to say, that the underwriter is injured by allowing of an abandonment, at any time, whilst the loss continues total. The assured is, by the policy, warranted in prosecuting for the recovery of the property. If he succeeds, it will go in diminution of the loss. If he do not, he has acted only according to his authority, and as the loss is then total, the underwriter is, of course, liable for the full amount. To adopt the rule contended for by the now plaintiff, would render almost every technical, a total loss. It would deprive the insurer of the agency of the insured, and oblige him always to send a special deputy to take care of his concerns. The property being originally that of the assured, he has a right to calculate when the abandonment is to be made.

*Pendleton*, in reply, referred to *Gibson* and *Johnson* v. *Hunter*, 2 *H. Black.* 187, in support of his positions respecting a demurrer to evidence, and in-

sisted, that the *spes recuperandi* was a part of the insurer's right, and ought to be abandoned to him.

ALBANY,
February, 1805.

Smith
v.
Steinbach.

*Per curiam*, delivered by *Lansing*, chancellor.— On this case, three points have been made. 1st. Whether there is proof that the freight is within the policy? 2d. Whether the insurer is bound to respond for the loss occasioned by a seizure, on suspicion of a breach of neutrality? 3d. Whether the abandonment was not too late to found any right or recovery on?

The plaintiff, by the demurrer to evidence, has admitted every fact which the jury could have found from the evidence.*

From the demurrer, it appears, that the defendant to maintain his issue, had proved that *De Govert*, on whose account the insurance was made, was owner of the vessel, the freight of which was insured by the policy ; that he was an American citizen, and that the ship was purchased in the *United States*, of an American citizen. It is further stated, that in the policy she was described as the American ship *Catharine*, and that the defendant had produced the necessary preliminary proofs before the policy was read. These preliminary proofs, among others, from the obvious import of the terms, must have been the evidence that the policy attached to the ship *Catharine*, and, of course, she was an *American* bottom. This has not been a point in controversy, but it is necessary to advert to it, in making certain deductions, which, I think, must determine the first point.

> * *Cocksedge* v. *Fanshaw*, Doug. 127. *Livingston* v. *Shutz*, in this court.

The policy, *on freight*, was on a voyage " *at and from Barcelona to Baltimore*." The ship was seized in the harbour of *Barcelona*.

ALBANY,
February,1805.

Smith
v.
Steinbach.

It is laid down as a rule, that if an insurance be " *at and from*" a place, the risk commences from the time of subscribing the policy, if the ship is *at home*. If *abroad*, from the first moment of her arrival at the place specified.

2 *Marsh.* 615.
*Tonge* v. *Watts*,
2 *Str.* 1251.

An insurance on freight, commences at the time the goods are first on board. It has been held that an intention to deviate, will not avoid the policy, and that a risk, once commenced, cannot be apportioned.

If these principles are correct, the policy attached on the freight the instant the goods were embarked at *Barcelona*, which, as related to the ship, was a foreign port. Whatever change in the destination of the vessel might have been contemplated, the risk having commenced, the insurer was entitled to the premium, and if the insured had, by changing the destination of the voyage, diminished the risk, by a deviation not warranted by the policy, he would have lost his money, without any correspondent benefit.

Until the destination of the vessel was actually altered, she was covered by the policy, and as she was at the port of departure, unless the contrary appears, it is to be presumed she was there for the purpose of pursuing her voyage to *Baltimore*.

As to the second point, I know of no instance in which bare suspicion has been considered as *proof* of *breach of neutrality*. It is the every day's practice of belligerents to capture and send into port, neutral vessels navigating the ocean, on the slightest suspicion, which, the rapacity of the captors converts into confirmation so vehement, as to amount to positive proof; but an allegation of the conviction by

the captors, of the truth of such suspicion, can form no ground for judicial decision, or to infer a breach of neutral duties. There is no other difference between this case and that of stopping a vessel on the seas, on suspicion, but that here, the seizure was in port, by an agent, more intimately connected with the government, than those agents who search and send in vessels. But the suspicions of neither can be a guide to the tribunals of our country (who only receive foreign judicial acts as *prima facie* evidence) unless they have been proved to be well founded.

Within the intent of the policy, this is a mere act of power—a restraint by a foreign prince.

The doctrine of abandonment is only adapted to the case of a *partial* loss, connected with a *total* one, by the operation of law. It is expressly founded on the consideration that the subject insured, though not totally annihilated, for then, nothing would be left for abandonment, is so much deteriorated by the perils insured against, as not to make it worth holding to the insured. It is a doctrine calculated to distinguish between average and technical total loss, as far as respects the insurer, not to create new duties, or impose new burthens on him, but to protect him from practices to which he might be exposed, by speculations on the state of the markets, or other contingencies, which may influence the value of the property insured.

The English doctrine on this subject laid down by lord *Mansfield*, in the case of *Mitchell* v. *Edie*,* and afterwards adopted and confirmed by lord *Kenyon*, in the case of *Allwood* v. *Henkell*,† and which appears to me well founded, is, that the insured must,

*1 D. & E. 608.

† *Park*, 172.

ALBANY,
February, 1805.

Smith
v.
Steinbach.

* 2 Burr. 1198.

in the first instance, make their election whether they will abandon or not.

In the case of *Hamilton* and *Mendez*,* lord *Mansfield* observes, " the plaintiff's demand is for an indemnity ; the action, then, must be founded on the nature of his damnification, *as it really is at the time of the action brought.* It is repugnant upon a contract of indemnity to recover as for a total loss, when the final event has decided, that the damnification, in truth, is an average, perhaps no loss at all." So this would be equally repugnant to the nature of the contract, to apply the doctrine of average loss, to a case in which the final event, as far as it has any bearing on the point in controversy between the parties, has determined it a real total loss. For the ship is still detained, and, if she was liberated, the freight which was the object of insurance, is as completely lost, as if she had been sunk in the ocean.

Whence, then, is the estimate of average loss to be taken ? and what would the abandonment transfer, from the insured to the insurer ?†

† 2 Dal. 280.
Cumberland v.
M'Call.

It is certainly not the interest of the insured to delay an abandonment. By doing so, he incurs many disadvantages. His rights on the policy are suspended, and any event which may restore the property insured, however much injured, places him in a situation to recover only an average loss.

Upon the whole, I am of opinion that the insured, when the loss on the policy happened, had it in his election to abandon. That by his delay, he has waived his right of abandoning, so far as might operate to convert an average, into a total loss, and has left the insurer the chance of enjoying the advantage

arising from restoration, intermediate the time in which he waived it, and bringing his action, so as to preclude him from recovering for a technical total loss. But as the loss has continued *really total*, that the defendant had a right to recover, as for such total loss. I am, therefore, clearly of opinion, that the judgment of the supreme court is correct, and that it ought to be affirmed.

Judgment of affirmance.